CONSOLIDATED FOR DISCOVERY
AND PRETRIAL MATTERS

| | | |
|---|---|---|
| **JACQUELINE E. WADE,** | ) | **No. 3:05-0076** |
| **v.** | ) | **JUDGE ECHOLS** |
| **AUSTIN PEAY STATE** | ) | |
| **UNIVERSITY** | ) | |
| | ) | |
| **NANCY J. DAWSON** | ) | **No. 3:05-0097** |
| **v.** | ) | **JUDGE ECHOLS** |
| **AUSTIN PEAY STATE** | ) | |
| **UNIVERSITY** | ) | |
| | ) | |
| **MARY M. WARNER** | ) | **No. 3:05-0229** |
| **v.** | ) | **JUDGE ECHOLS** |
| **AUSTIN PEAY STATE** | ) | |
| **UNIVERSITY** | ) | |
| | ) | |
| **CHERYL D. GARRETT** | ) | **No. 3:04-1150** |
| **v.** | ) | **JUDGE ECHOLS** |
| **AUSTIN PEAY STATE** | ) | |
| **UNIVERSITY** | ) | |

## MEMORANDUM

Pending before the Court are Defendant Austin Peay State University's ("APSU's") Motion For Summary Judgment As To Plaintiff Jacqueline E. Wade (Docket Entry No. 176), Motion For Summary Judgment As To Plaintiff Nancy J. Dawson (Docket Entry No. 183), and Motion for Summary Judgment As To Plaintiff Mary M. Warner (Docket Entry No. 205), to which the *pro se* Plaintiffs responded in opposition, and APSU filed replies.

Plaintiffs Jacqueline E. Wade, Ph.D. ("Dr. Wade"), Nancy J. Dawson, Ph.D. ("Dr. Dawson") and Mary M. Warner ("Ms. Warner") are African Americans who were formerly employed at APSU. They filed separate actions against APSU in early 2005. In Amended Complaints filed in

1

October 2006, all three Plaintiffs alleged claims of race discrimination, racially hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1983, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA").[1] Plaintiffs seek compensatory and punitive damages, back pay and front pay, injunctive relief, attorney's fees, and costs.

## I. <u>FACTS</u>

The Court first observes that Dr. Dawson and Ms. Warner did not comply with Local Rule 56.01, which requires the non-moving party to respond by admitting or denying each statement of material fact set forth by the Defendant in support of its motion for summary judgment. Rather, these two Plaintiffs filed their own statements of material facts without responding to Defendant's filing. Despite these Plaintiffs' failure to comply with Local Rule 56.01, the Court will consider all of their filings in ruling on the motions for summary judgment.

Beginning in March 2000, APSU, like other State of Tennessee higher education institutions, underwent severe budget cuts for several years. These budget cuts or impoundments at APSU totaled $6,613,700. In fiscal year 2000-2001, the State of Tennessee reduced financial support for APSU by $826,500. The next fiscal year, 2001-2002, state support decreased by an additional $287,200. Although the appropriation initially increased by $700,000 in fiscal year 2002-2003, an

---

[1]Dr. Wade and Ms. Warner also alleged claims of age discrimination in their Amended Complaints, but they asserted few, if any, relevant facts in support of the claims, and they did not address age discrimination in their summary judgment filings. The Court finds that Plaintiffs failed to plead properly or they abandoned any claims for age discrimination.

impoundment in the spring of 2003 resulted in a loss of funding in the amount of $1.5 million. Cuts occurred in state appropriations for fiscal year 2003-2004 in the amount of $2.8 million.

To make the required budget cuts, APSU administration, led by President Sherry Hoppe, allocated the diminishing resources first to instruction, followed by academic support (such as tutorial services, computer labs, library, etc.), and finally to programs that did not involve either instruction or academic support. Other criteria taken into account during the process of making budget cuts were the impact of the proposed cut on accreditation requirements, the extent to which the cut would violate affirmative action or other legal mandate, and whether less costly alternatives for providing the program or function existed or could be created. Examples of programs eliminated or revamped include the Office of International Education, the Academic Advisement Center, and the Office of Multi-ethnic Services. Most supervisors at APSU had to operate with fewer resources, including fewer staff members. (Docket Entry No. 179, Hoppe Aff. ¶¶ 6, 14.)

The Plaintiffs contend that these budget cuts had a disparate impact on African American students and staff, and that Plaintiffs personally were subjected to race discrimination and a racially hostile work environment. Plaintiffs further contend that they were subjected to retaliation because they complained to their administrative superiors, including President Hoppe, and to the EEOC about race discrimination at APSU. The Court will now examine the facts unique to each Plaintiff.

Dr. Wade

Dr. Wade was employed at APSU from July 1996 through August 31, 2003, as the first full-time Director of the Wilbur N. Daniel African American Cultural Center ("AACC"). She was responsible for the AACC's overall leadership and management of its programs. The AACC had the unique mission to conduct major programs and provide African American-centered activities that

3

focused on the contributions, achievements and socio-cultural perspectives of African Americans and other people of African descent. This mission was meant to help APSU become a welcoming environment for African American students and other African Americans who had been affected by the history of racial segregation in state institutions of higher learning. Dr. Wade revitalized the AACC by conducting many programs and services year round, and in doing so received outstanding performance evaluations for the first six years of her tenure. Even though performance evaluation standards changed university-wide in 2001 after President Hoppe's appointment, Dr. Wade continued to receive open praise from her supervisor, Dr. Joe Filippo, Assistant Vice President of Academic Affairs, for her job performance. She provided supervision and direction to all full-time, temporary and student AACC staff, and she oversaw the AACC budget. During the first four years of her directorship, APSU provided Dr. Wade with adequate budgets, full-time staff, and student workers. The AACC had a programming budget supplied by the Office of Academic Affairs and an operational budget supplied by general operation funds. The co-curricular work of the AACC helped to enhance the classroom learning processes of African American students specifically and all students generally. (Docket Entry No. 211, Wade Aff. ¶¶ 2, 4-7, 22, 24-25.)

When Dr. Wade became director, the AACC was part of the Office of Enrichment Programs ("OEP") established by President Hoppe's predecessor as a means of "equalizing" all of the co-curricular programs on campus. Although there were a total of fourteen co-curricular programs in OEP, only five of them offered courses for credit: the African American Studies Program ("AASP"), the Women's Studies Program, the Heritage Program, the Honors Program and the International Studies Minor. In August 2001, APSU hired its first full-time director of the AASP, Dr. Dawson. The AACC and the AASP were the only stand alone programs in the OEP and the only programs

4

run by African Americans.  The International Studies Center was run by a Chinese American immigrant who was a tenured professor in the Psychology Department.  All of the other programs in OEP were run by Caucasian faculty members whose directorships of OEP programs were part-time positions.  The Caucasian directors were full-time faculty members with tenure or they were tenure-tracked, and they taught in traditional academic departments during the regular nine-month teaching year.  These directors' respective departments provided them with administrative and secretarial support.  Dr. Wade and Dr. Dawson were the only full-time directors of OEP programs. (Id. ¶¶ 9-11, 13-18.)

In 1997 Dr. Wade was elected as the tri-chair person of the AASAF organization that was established long ago at APSU.  This organization was considered to be the collective voice of African Americans at APSU.  When Dr. Hoppe was appointed interim President, the AASAF officers held a meeting with Dr. Hoppe to let her know that the group stood ready to assist her in understanding the needs and interests of the African American community.  (Id.  ¶¶ 20-21.)

In April 2000 at a program celebrating the re-opening of the AACC following a tornado, Dr. Hoppe proclaimed that she wanted to see the day when the AACC became a "center for all cultures." (Id. ¶ 26.)  Late that month, concerned African American student groups sent Dr. Hoppe a written statement of their concern about her seeming lack of support for their cultural needs and interests. Dr. Hoppe invited Dr. Wade to a subsequent meeting between her and the students.  During the meeting, Dr. Hoppe asked Dr. Wade if she heard Dr. Hoppe say that she wanted to see AACC become a "center for all cultures?"  Dr. Wade attests that, when she answered, "yes," it became palpable that Dr. Hoppe was not happy with her answer, and Dr. Hoppe stated she was "surprised to hear a University administrator say this."  Dr. Wade believes this incident marks the beginning

5

of racially disparate treatment and retaliation directed toward her by Dr. Hoppe and members of her senior staff during the next three years for advocating AACC program objectives. (Id. ¶¶ 27-30.)

In June 2000, Dr. Hoppe refused Dr. Wade's request to fill the AACC Secretary III position that had been vacant since September 1999. She also eliminated the vacant summer employee position that had been part of Dr. Wade's regular summer staff. Although Dr. Hoppe gave as a reason mandated budget cuts, Dr. Wade attests that Dr. Hoppe's reason was a pretext for discriminating against her. Dr. Wade met with Dr. Hoppe about her decision to reduce AACC staff. According to Dr. Wade, after rejecting the appeal, Dr. Hoppe stated this "should teach you to decide which side you are on." When Dr. Wade asked her to explain the comment, Dr. Hoppe allegedly said, "You should have filled the position when you had the chance" and abruptly ended the meeting without further comment. (Id. ¶¶ 31-33.)

In the summer of 2000, for the first time since beginning her directorship, Dr. Wade had to close the AACC for the month of July in order to take her usual vacation. Also in July 2000, Dr. Hoppe eliminated the AACC's $10,000 programming budget and gave as the reason mandated budget cuts. Thus, Dr. Wade felt she was forced to work without staff and funds. During June and August 2000, just as during the regular school year, she was the only staff member in the AACC and handled both her duties and the secretarial duties. This situation persisted until summer 2002 when Dr. Wade was allowed to hire a secretary at the declassified level of Secretary II. Dr. Wade felt Dr. Hoppe's actions in cutting staffing and funding were in retaliation for her position as an AASAF officer and the pressure that AASAF placed on Dr. Hoppe to reinstate the Affirmative Action Officer, LaVerne Walker, an African American female, to the President's cabinet. According to Dr. Wade, under the guise of administrative re-organization, Dr. Hoppe removed Ms. Walker from the

6

cabinet and placed her under the Director of Human Resources, Bob Bird, a Caucasian male who had been openly critical of previous actions taken by Ms. Walker in furtherance of her role. Dr. Hoppe also promoted Bird to Executive Director of Human Resources without an advertised search that would have allowed African Americans to apply. Dr. Wade asked her supervisors, Dr. Hoppe, Dr. Filippo, and Dr. Bruce Speck, Vice President of Academic Affairs, verbally and in writing to restore her budget or provide Geier funds[2] to underwrite the needs of the AACC, but her requests were ignored. Ms. Walker previously had provided Geier funds for AACC programming. However, during 2001-2002, Ms. Walker was not able to supply as much funding as she had in previous years because Dr. Hoppe did not prioritize AACC's program funding needs in her directions for that year's use of Geier funds. After Ms. Walker left APSU in December 2002, Richard Jackson, an African American, was appointed as Director for Affirmative Action and Diversity Affairs, EEOC Officer and Legal Counsel for APSU. (Id. ¶¶ 35-40, 43, 47-53.)

As an AASAF officer, Dr. Wade participated in an effort to include African Americans on the Search Committee for a permanent APSU president in 2001 when Dr. Hoppe was a candidate for the permanent position. When Dr. Hoppe was named as a finalist, Dr. Wade and other AASAF officers held a conference call with Tennessee Board of Regents ("TBR") Chancellor Charles Manning to report the organization's preferences among the final candidates. Dr. Hoppe was not among those preferred by AASAF; however, in July 2001, Dr. Hoppe was appointed permanently to the position of APSU President. Dr. Wade believes that, in retaliation for working with AASAF to express an opinion about the incoming president, Dr. Hoppe took action to declassify the AACC

---

[2]"Geier funds" refers to money available under a settlement and consent decree which addressed racial disparities in Tennessee higher education. See e.g.Geier v. Sundquist, 128 F. Supp.2d 519 (M.D. Tenn. 2001).

secretarial position from III to II and failed to restore program funding for the AACC. Dr. Wade claims that Dr. Hoppe did not take any similar action against Caucasian administrators who opposed her selection as president. (Id. ¶¶ 59-66.)

While Dr. Wade admits that neither Dr. Hoppe nor any of her top administrators used racial epithets against her, Dr. Wade perceived that Dr. Hoppe acted toward her in a hostile manner and there were acts of "racism that I believed was an essential part of the racially hostile climate on the campus." Dr. Wade claims that her direct superiors, Dr. Filippo and Dr. Speck, refused to advocate for her stating, "this is what Dr. Hoppe wants." In a meeting about the AACC and the AASP, Dr. Speck stated to Dr. Wade that he "was tired of your arm-twisting and resistance to my decisions." He also made clear that he would not tolerate Dr. Wade's and Dr. Dawson's "pushiness" and "uppityness." Dr. Wade was offended by the latter comment as "covert racial denigration." Dr. Wade "limped along" without adequate staff and funds. She felt that none of the co-curricular programs directed by Caucasian directors suffered the same budget and staff cuts as the AACC. (Id. ¶¶ 68-81.)

When Dr. Hoppe reorganized and dismantled OEP, the co-curricular programs managed by Caucasian directors went back to the sponsorship of the academic departments in which the directors served as regular full-time faculty. Only the AACC and the AASP remained as stand alone programs when the OEP was dismantled. (Id. ¶¶ 82-85.)

Dr. Wade attests that she was not recruited for internal promotions, she was not offered a joint faculty-administrator appointment, and she was not offered an upgrade in status to an Executive Director position which would have increased her salary and professional status on campus. She claims that Caucasians received such consideration. (Id. ¶¶ 88-106.)

8

In 2003, Dr. Hoppe proposed a reorganization plan for APSU. The AACC and the AASP were assigned to the Department of History and Philosophy. Dr. Wade and Dr. Dawson objected, and ultimately Dr. Speck placed the AACC as a direct report to the Dean of the College of Arts and Letters. Dr. Wade states she was not given an opportunity to upgrade her administrative rank under this new reporting line and the AACC did not receive any funding support from the College of Arts and Letters. Dr. Wade received a memorandum from Dr. Speck which she considered to be very antagonistic, amounting to racial harassment. She responded the same day and from then on felt she was treated in a hostile manner by Drs. Hoppe, Speck, and Filippo. Dr. Wade attests that various studies and investigations showed the existence of racism on the APSU campus. (Id. ¶¶ 109-132.)

On April 30, 2003, Dr. Wade filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") complaining of race discrimination. Thereafter, Dr. Hoppe offered Dr. Wade a 10-month, rather than her usual 12-month contract, with a salary reduction of $10,000. Dr. Wade claims that no other Caucasian staff member at APSU received such a drastic cut in salary. Dr. Wade felt she was constructively discharged and that she had no choice other than to leave APSU in August 2003. (Id. ¶¶ 133-141.) Dr. Wade provides the affidavit of Dr. Dawson and various unauthenticated documents. The Court has reviewed this material, although it is not summarized here.

Dr. Hoppe attests that APSU and TBR policies provide for faculty and non-faculty employees to be hired and/or subsequently converted to ten-month contracts. According to guideline p-030 in TBR's policy and guidelines manual, "Modified Fiscal Year appointments (MODFY) is an alternative employment base for non-academic personnel . . . service period is less than twelve-month fiscal year and will generally coincide with the nine month calendar."

9

Employees converted to MODFY are paid in twelve monthly installments, so as not to interfere with benefits. Dr. Wade's position was converted from a 12-month contract to a 10-month contract as part of a university-wide budget reduction; however, Dr. Wade remained in a professional level position. (Docket Entry No. 179, Hoppe Aff. ¶ 7-8.)

While Dr. Wade's position was the only professional level position in the 26 positions that was converted from 12 months to 10 months in 2003-2004, three professional positions were affected by budget cuts in the previous years. The Academic Advisement Center and Multi-ethnic Services were completely eliminated. The Director of the International Studies Office was converted from an administrative 12-month contract to a 9-month faculty contract and his salary was reduced. One African American affected by job elimination was transferred to another equivalent position at her existing salary and the other African American was offered a lateral transfer but declined. At least five vacant professional positions were affected by budget cuts in 2001-2003 (Capital Projects Coordinator, Assistant Director of Purchasing, Events Coordinator, Financial Aid Counselor, and Assistant Registrar). (Id. ¶ 9.)

Although Dr. Wade claims that she was treated differently from Caucasians, Dr. Hoppe attests that the job of Marlon Crow, a Caucasian Associate Director, Center for Excellence in the Creative Arts, was totally eliminated during budget cuts while Dr. Wade's position was only reduced. The Center for Excellence in Field Biology, headed by Director Ben Stone, a Caucasian, was funded through special appropriations for centers of excellence and from more than $300,000 in externally funded grants for which the center applied. Gaines Hunt, a Caucasian who was Director, Center for Environmental Education, received a stipend for serving as Director while working fulltime as a department chair or dean. The stipend included not only farm coordination

10

but also hard physical labor such as hay baling and loading. Carmen Reagan, a white female and Director, President's Emerging Leaders, was a full-time faculty member. She received only release time for serving as Director. The primary job of Jill Eichhorn, a white female who was Director, Women's Studies, was as a full-time faculty member. She received only release time and no stipend. Karen Swenson, a white female, also served as a full-time faculty member. As Director, Distinguished Lecture Series, she received only release time and no stipend. Allene Phy-Olsen, Caucasian, held the primary job of full-time faculty member. As Director of the Honors Program, she received only release time and no stipend. Houston Davis, a white male, served as Director, Presidential Research Scholars. He coordinated the program as part of his regular job responsibilities and received no compensation or reassigned time. (Id. ¶ 10.)

Dr. Hoppe further attests that, during her presidency, she annually attended events at the AACC and supported their programs. The AACC was treated like all other enrichment programs and other academic departments during the academic reorganization process and in the allocation of funds. Despite the significant budget cuts from 2001 to 2003, the AACC budget increased, from $133,695 in 2001-2002 to $157,015 in 2002-2003. By comparison, Women's Studies Program budgets totaled $3,989 and $2,927 in the same years and International Studies budgets were $113,964 in 2001-2002 and $18,717 in 2002-2003. (Id. ¶ 11, 31)

The AACC operating budget, which includes programming dollars, was not totally eliminated. However, between 1999 and 2000, two accounts were combined with no reduction in total operating expenses of approximately $24,000. A reduction of approximately $7,000 in AACC operating funds occurred as part of university-wide budget cuts in 2002-2003 that totaled $2.8 million. However, the AACC continued to receive a special allocation through Student Activities

11

Funds and was not required to go through regular procedures to obtain such funding. The AACC was the only enrichment program to receive such an allocation of funding without going through the proposal/request process during the entire time Dr. Wade served as director. (Id. ¶ 13.)

Dr. Hoppe further attests that, despite the severity of APSU's ongoing budget situation, financial support for the AACC increased during her administration. Total salaries and benefits for center staff in the year she assumed office totaled $70,332. In 2002-2003, staff salaries and benefits totaled $94,982, partially as a result of a part-time secretary being changed to full-time in 2002-2003. The overall expenditures attributed to the AACC in 2001-2002 was $112,413 and increased to $127,852 in 2002-2003. (Id. ¶ 15.)

The AACC secretarial position was temporarily frozen in 2000-2001, and was one of 19 frozen staff positions and five frozen faculty positions (not including two faculty positions that were eliminated). These positions were frozen when they were unfilled due to resignations, etc., to avoid laying off individuals in filled positions. Dr. Hoppe attests that Dr. Wade was not alone in the freezing of her secretarial position; many departments operated under the stress of additional workload as a result of frozen positions and many of those supervisors expressed concerns about the budget cuts, too. Dr. Hoppe reduced secretarial staff in her own office from two to one. Most of the directors worked on enrichment programs on a part-time basis for release time from teaching responsibilities. None had a secretary except Ben Stone (who received Center for Excellence funding and grant funding) and Gaines Hunt (whose secretary related to his role as department chair). All of the part-time directors had budgets that were typically less than five percent of Dr. Wade's budget, yet they had regular programming and activities. While the full-time faculty salaries of those also serving as part-time directors with no monetary compensation were not cut, their

12

release or reassigned time was. The request to unfreeze the clerical position for the AACC was considered along with requests from numerous other department heads who had frozen positions. The secretarial position was unfrozen in 2001-2002, while numerous other support positions remained frozen. (Id. ¶¶ 16-18, 20.)

Additionally, Dr. Hoppe attests that, while Dr. Wade did have to run the AACC for a time with no help other than student workers, other program directors had to work under similar circumstances. The Women's Studies Program never had a full-time secretary. The Director's position is not full-time, and the director is a faculty member on a nine-month contract. She is given no reassigned time from her 12-hour teaching load. The Women's Center has never been open in the summer. Approximately 56-58% of APSU students are women, and approximately 19% of APSU students are African American. (Id. ¶ 19.)

While the AACC was closed for two months in the summer of 2003 as a result of significant budget cuts, Dr. Hoppe does not believe the closing had a negative impact on the experiences of African American students since only one activity at AACC occurred in each of the summers from 2000 to 2003. This "social development" activity, described in a report by Dr. Wade, did not, in the opinion of Dr. Hoppe's executive team, warrant leaving the AACC open when APSU reduced other major university functions which did have significant activity in the summer. All academic department secretaries were reduced to a 10-month contract as part of the budget cuts despite the fact that numerous students were enrolled in classes in their departments during summer sessions. Budget cuts also required total closing of the International Studies Office and the Academic Advisement Center. (Id. ¶ 21.)

13

Dr. Hoppe attests that, to her knowledge, the AACC never received <u>Geier</u> funding for programming. The one documented request for <u>Geier</u> funding for 2002-2003 was denied at the state level. Applications for <u>Geier</u> funds are made annually to the TBR. Priority for funds at APSU typically has been for student scholarships and faculty/staff development. To fund the requested AACC secretarial position with <u>Geier</u> funds would have required cutting a previously approved allocation. (<u>Id.</u> ¶¶ 22-23.)

According to Dr. Hoppe, the academic reorganization process at APSU was a six-month long series of proposals and responses and all affected departments and colleges had full opportunity for input. The primary purpose for the reorganization was to improve overall university efficiency. In the case of the AACC and the AASP, suggestions from the two directors, Dr. Wade and Dr. Dawson, and from several students resulted in the modification of the original proposal. While Dr. Speck's initial proposal recommended moving the AACC from the Office of Enrichment Programs in the academic division to the student affairs division, upon the request of Dr. Wade and Dr. Dawson to keep their programs in the same division, Dr. Speck modified his recommendation to put both programs under the Dean of Arts and Letters, an academic division. (<u>Id.</u> ¶¶ 24-25.)

Dr. Hoppe further attests that, from the time she became interim President to the present, she directed her senior staff to increase representation of African Americans in academic departments where they were under-represented or had no representation. She directed the use of <u>Geier</u> funds in combination with university funds to accomplish this. For example, an African American is currently employed as a <u>Geier</u> Scholar in the music department. In fall 2004, Dr. Hoppe directed creation of a <u>Geier</u> position in Astronomy and an African American signed a contract to begin employment, but he delayed his contract for personal reasons. She also approved a contract that

14

transferred (without going through regular search processes) an African American professional staff member to a faculty position in a department that previously had no African American representation. This individual is a part of a <u>Geier</u> Grow-Your-Own program in which she is being supported financially in her attainment of a doctoral degree. Regular desegregation funds requested to support faculty and administrative hiring and retention, as well as other-race undergraduate student recruitment and retention totaled $175,000, $176,400, and $193,500 annually in 2001-2002, 2002-2003, and 2003-2004, respectively. APSU's awards under the <u>Geier</u> consent decree increased dramatically. In the year prior to Dr. Hoppe's arrival, APSU received less than $2,500. In 2001-2002, the amount increased to more than $14,000 and by 2002-2003 to more than $200,000. In 2003-2004, the amount totaled almost $300,000. (<u>Id.</u> ¶ ¶ 26-27.)

Additionally, Dr. Hoppe attests that in all the years since she became President, APSU met or exceeded affirmative action goals for African Americans in all employment categories based on national availability standards. Several African American professional staff have been employed or promoted since she became President, including the following positions: Director of Student Life and Leadership, Director of University Recreation, Assistant Director of Housing and Residence Life, Safety Inspector, and Manager of the Center for Creative Arts. (<u>Id.</u> ¶¶ 28-30.)

In Dr. Hoppe's view, African American faculty and staff were not disparately impacted by budget cuts. She indicates her view is substantiated by a review by the TBR general counsel prior to the cuts and the Office of the State Comptroller after the cuts. Examples of absence of disparate impact are evidenced in the fact that, of the five staff members who totally lost their jobs in July 2003 as a result of budget cuts, none were African Americans. Of the 26 professional/support staff members whose jobs were targeted for reduction to 10 months or 82.5% in that same budget cycle,

15

approximately 20% were African Americans, which is approximately the same percentage of African Americans in APSU's workforce. In a previous budget cut, the two African Americans whose jobs were eliminated in 2002 were both offered transfers to comparable positions within the university. One chose to accept the transfer and the other chose to resign. (Id. ¶ 29.)

Dr. Hoppe's senior staff included three vice-presidents and the university counsel. Two of the four are African Americans. Several African Americans served on her President's Circle of Advisors. She appointed a Minority Task Force to improve the retention of African American students. She supported her Senior Advisors' attendance at conferences for recruitment of African American faculty. Dr. Hoppe attests that she endeavored to make the campus climate welcoming for faculty, staff and students of all races, and she supported affirmative action. She attended the Asanbe Diversity Symposium, hired an African American as department chair in music, insured that APSU met or exceeded affirmative action goals in all employment categories, hired an African American to serve as affirmative action manager, hired an African American as assistant to the Provost, promoted an African American from clerical to professional, nominated an African American to participate in Leadership Clarksville, hired an African American chemistry faculty member and promoted an African American accountant to a faculty position and provided Geier funding for her to pursue a doctorate. (Id. ¶ 32.)

In a second affidavit, Dr. Hoppe attests that Dr. Jennifer Meningall, an African American who was Vice President for Student Affairs, authorized an APSU psychology professor, Dr. Rhonda Bryant, to study the academic, interpersonal, and social support needs of "at risk" African American students at APSU. Dr. Meningall rejected the study for several reasons, including that it was statistically invalid and the researcher failed to review her results with other committee members

16

before submitting what was purported to be a "final" report. According to Dr. Hoppe, Dr. Wade did not present any evidence that any purported fnding by Dr. Bryant affected Dr. Wade's ability to perform her duties during budget cuts. Annual reports provided by Dr. Wade showed no significant changes during the years in question. Additionally, Dr. Hoppe attests, a Racial Climate Study conducted by Dr. Houston Davis (Caucasian) and Dr. Eleanor Graves (African American) used the themes identified in the Bryant study, as well as themes identified in a study done by Raymond Winbush. The Davis/Graves study did not substantiate the findings of the non-statistically valid findings of the Bryant or Winbush Studies. (Docket Entry No. 227, Hoppe Aff. ¶ 6.)

Various unauthenticated documents were submitted by APSU, and the Court has reviewed that evidence. Additionally, the Court reviewed the affidavits of Dr. Filippo and Dr. Speck, although their content is not summarized here.

Dr. Dawson

Dr. Dawson attests that she was hired in August 2001 to be APSU's director of the African American Studies program ("AASP"). The program was housed in a division entitled Enrichment Studies. It was the first time the Enrichment Program had a professor whose locus of tenure was in Enrichment Studies. A special document was prepared and approved by APSU and the TBR outlining her tenure process. Dr. Dawson's responsibilities included the revitalization of the AASP program through teaching, programming, and curriculum development. When she became director, there was only one African American Studies course and there were about 11 students in the program who were minoring in the subject. Under her directorship, the program gained popularity and by the end of the 2001-2002 academic year, there were about 45 students minoring in African American Studies, six new courses had been added to the curriculum, and nearly 200 students were

17

taking classes–accounting for a significant increase in student credit hour production. (Docket Entry No. 217, Dawson Aff. ¶ 2.)

Dr. Dawson believes the success of her program was the beginning of her problems at APSU, because the rapid growth of African American Studies upset some faculty and staff. Problems emerged with some academic advisors who tried to direct students away from AASP and other faculty attacked the content of the curriculum. (Id.)

In September 2002, Dr. Dawson received permission to search for an instructor/assistant professor position in African American Studies. She assembled a search committee of qualified faculty and staff. Her supervisor told her that she could not have an all-African American search committee. She asked him why he did not have a problem with all of the search committees on campus that had all Caucasian faculty, which in fact was quite normal because there were so few African American faculty on campus. As a result, a memo was sent out stating that all search committees were required to have African American representation. Consequently, Dr. Dawson attests, black faculty, who knew nothing about a department or program, were placed on search committees to be mere tokens. She alleges that this action was in direct retaliation for the African American Studies search committee that she assembled. The members of her search committee were simply the faculty and staff associated with African American Studies; their membership on the committee had nothing to do with race. However, APSU soon aborted the AASP faculty search because AASP was not producing enough credit hours. Dr. Dawson believes that the statistical manner in which the program was evaluated was biased, especially since it met the criteria in the first place. (Id. ¶ 4.)

18

At Dr. Dawson's urging, Dr. Speck and Dr. Filippo agreed to bring two experts to the campus, Dr. Fred Hord, director, Association of Black Cultural Centers, and Dr. James Stewart, past president of the National Council for Black Studies. According to Dr. Dawson these two organizations are among the premier professional groups governing African American Studies and African American Cultural Centers. The purpose of bringing the two experts to APSU was to foster greater sensitivity between faculty and staff concerning AASP and AACC. Dr. Dawson believes, however, that their visit on November 7, 2002 caused some faculty and staff to further resent the programs. (Id. ¶ 3.)

Dr. Dawson further attests that, as the 2002-2003 academic year unfolded, so did other forms of retaliation. On January 28, 2003, she states she received a telephone call during class time from Dr. Filippo. He asked to see her in her office immediately. When he arrived at Dr. Dawson's office about ten minutes later, Dr. Dawson was greeted by Dr. Filippo, Richard Jackson, APSU's Legal Counsel, and a representative from the campus police. She was told that Dr. Jennifer Menningall, Vice President for Student Affairs, reported that Dr. Dawson called her the day before and told her that a student had been raped by a professor on campus. According to Mr. Jackson, Dr. Dawson had refused to give Dr. Menningall the names of the student or the professor. In shock, Dr. Dawson informed the group that she did not speak to Dr. Menningall the day before and she did not know anything about such an incident. Mr. Jackson stated that Dr. Hoppe had launched an official university investigation into the incident and he was acting on her behalf. He asked Dr. Dawson not to discuss the matter with anyone. The next day, Dr. Dawson met with Mr. Jackson and Dr. Mennigall to discuss the issue. Dr. Mennigall said that someone called her office about noon on January 27, 2003, and the person "sounded like" Dr. Dawson. Dr. Menningall told Dr. Hoppe, who

19

authorized an investigation into the rape allegation the next day. Mr. Jackson said he had to pull Dr. Dawson from her class because in rape cases time is important. Dr. Dawson stated she felt the investigation was handled inappropriately. She asked why more facts were not assembled and why she was not called at home. She asked for any written documentation regarding the case and asked for an official apology from APSU. Dr. Dawson told Mr. Jackson she was the victim if someone was pretending to be her. According to Dr. Dawson, Mr. Jackson told her he did not owe her anything. She told him she wanted to file a grievance for his rude behavior, but she did not know who to go to since he was the Affirmative Action officer. He said he would send her the information, but she did not receive anything further about this situation. (Id. ¶ 5.)

In March 2003, Dr. Speck submitted his university reorganization plan. The plan required AASP and AACC to report to the Department of History and Philosophy. These were the only two programs formerly a part of Enrichment Studies which were to report to an academic department instead of the Dean of the College of Arts and Letters. Therefore, Dr. Dawson felt she was treated differently than Women's Studies, the Honors Program, and others. She felt the contract she originally signed when she came to APSU had been violated and she would now be evaluated under an entirely different contract. She also expected to be evaluated by a department which in her view had a history of racial insensitivity. (Id. ¶ 6.)

On several occasions, Dr. Dawson expressed to Dr. Speck, Mr. Jackson and Dr. Filippo that she did not feel comfortable with APSU's history department and felt it was an inappropriate place to put African American Studies based on expert opinions and her personal interaction with some members of the department which she thought had been unfavorable. Dr. Dawson seems to allege that she asked to file a grievance about the hostile and racist environment in the Department of

20

History and Philosophy, but she was precluded from doing so. She also felt that correspondence she received from Dr. Speck on April 28, 2003 was unprofessional and a breach of confidentiality because Dr. Speck sent copies of his letter to the chair of the history department, whom she was accusing of racial hostility. On May 2, 2003, Dr. Dawson responded to Dr. Speck that she had decided to pursue a grievance process outside of APSU where she could receive a fair and equitable hearing. (Id. ¶ 7.)

On May 23, 2003, Dr. Dawson received correspondence from Dr. Speck stating that AASP would be under the auspices of the Dean, not the department head, and that in her role as director of the program, she would report to the Dean as well. However, her faculty appointment would be based in the department of history, just as the faculty of other enrichment programs were assigned to particular academic departments. Dr. Dawson believed there was much confusion about who was in charge of AASP. Dr. Dawson had additional communications with Dr. Speck and Dr. James Diehr, Interim Dean of the College of Arts and Letters, about the placement of AASP. (Id. ¶ 8.)

When school started in August 2003, Dr. Dawson felt she was the victim of constant and intense retaliatory acts because she complained about racism and racial discrimination. Her responsibilities were taken away from her. She was asked to submit unnecessary paperwork. Some of the faculty in the history department were indirectly using tenure and retention to frighten and harass her. She felt her academic freedom was being violated by not allowing her to have input in certain curriculum decisions impacting AASP. (Id. ¶ 11.)

In October 2003, two nooses were found on campus the weekend following the NAACP Freedom Fund Banquet. Frightened students asked Dr. Dawson to seek intervention. At an AACC Advisory Committee meeting, Dr. Dawson requested that a public statement be made. She felt she

21

was met with some hostility and resentment. Betty Wallace, a Caucasian professor in the history department and a member of Dr. Dawson's tenure review committee, felt that a public discussion about the issue would cause problems. Dr. Dawson attests that, after President Hoppe made a public statement, there was no more public follow-up. Students were left with unanswered questions and Dr. Dawson felt that retaliation against her intensified. (Id. ¶ 12.)

Due to the perceived retaliation, Dr. Dawson did not submit her dossier for tenure consideration in late 2003. She felt it was impossible for her to receive a fair and unbiased review by the history department. On January 26, 2004, she received a hand-delivered letter regarding her contract at APSU. She delivered a response on January 30, 2004, outlining retaliation and expressing a desire to stay at APSU if her numerous complaints could be addressed. She alleges that no investigation was initiated and she was given a notice of non-renewal of her faculty appointment. Dr. Dawson attests that members of the African American community have launched several complaints against APSU, and administrators have deemed certain race relations studies methodologically unsound when racial problems at the institution have been pointed out. (Id. ¶¶ 13-16.)

Dr. Hoppe attests that, while the AASP experienced a significant percentage enrollment growth from 2001 to 2004, an increase of 242%, the actual numerical increase was from 3.8 full-time equivalent students in Fall 2001 to 13.0 full-time equivalent students in Fall 2004. This total enrollment did not meet the minimum target for one full-time faculty member, which was 16 full-time equivalent students. This target was based on the Tennessee Higher Education Commission funding formula. During her presidency, Dr. Hoppe required that all new faculty positions be justified based on student credit hour production in comparison to funding formula ratios unless

22

accreditation requirements prevailed. For a new faculty member in African American Studies to be justified, student credit hours would need to exceed 240. In the year Dr. Dawson requested a new faculty member, student credit hours totaled 159, or 66% of target. Compared to other programs, an additional faculty position in AASP was not warranted. In that same year, the Sociology student credit hours production exceeded its target by 423%, thus justifying the need for two positions which were approved. (Docket Entry No. 186, Hoppe Aff. ¶¶ 6-7.)

According to Dr. Hoppe, it is not unusual for small programs to have only one faculty member. At the time Dr. Dawson requested a second faculty member, another program, Professional Studies, also had a single faculty member and Women's Studies did not have a faculty member assigned full time. Student credit hour production compared to target student credit hours for Professional Studies was 121% of target and Women's Studies was 46.2% of target. Dr. Dawson was not prohibited from hiring adjunct faculty to teach African American Studies classes. It would not have been prudent to use Geier funds for a new faculty member where student credit hour production did not demonstrate as strong a need as that of other departments. (Id. ¶¶ 8-10.)

Dr. Hoppe further attests that academic reorganization and university restructuring did not have a disparate impact on African Americans. Such reorganizations have affected six academic departments and fifty-three faculty since she became President in 2000. Of those, four faculty were African Americans. The academic reorganization took place after a six-month series of proposals and responses, with all departments and colleges having full opportunity for input. In the case of AASP and the AACC, suggestions from Dr. Dawson and Dr. Wade resulted in the modification of the original proposal. The assignment of Dr. Dawson for locus of tenure and personnel administration purposes to the history department was not out of the ordinary, as two other

23

universities in the TBR system have a similar structure. Further, Dr. Dawson's curriculum vitae reveals that she previously taught for five years as an adjunct faculty member at Rose College in the department of history and political science. (Id. ¶ 14.)

Although Enrichment Programs were not as adversely affected as other university programs, the directors' reporting mechanism changed. All departments at APSU now report to a different college, given the fact that all colleges within the university were re-titled and reconstituted with more or fewer departments. (Id. ¶¶ 15-16.)

Most of the individuals who would have served on the retention/tenure/promotion committees for Dr. Dawson would have been outside her subject area because her committee was made up of other individuals in Enrichment Programs, which included Field Biology, Creative Arts, Honors, Women's Studies, etc. The only member of her committee who would have had knowledge of African American Studies would have been Dr. Wade. (Id. ¶ 17.)

Dr. Dawson was not demoted or terminated, and her tenure track appointment was not interrupted in any way. Once reassigned to the history department for locus of tenure and personnel issues, Dr. Dawson was not forced to restart her probationary period toward tenure. Under APSU policy 5:060, she had the option to restart her five-year probationary period to protect her progression toward tenure, but she elected not to do so. Dr. Dawson also did not cooperate with her supervisor's request to observe her classroom teaching for retention purposes and she failed or refused to participate in meetings necessitated by her failure to address curriculum changes for the program she coordinated. Consequently, her tenure-track contract was not renewed following her failure to submit a dossier for retention review. Dr. Hoppe notified Dr. Dawson in January 2004 that her contract would not be renewed after January 2005. Dr. Dawson's contract ended

24

approximately two weeks after the beginning of the spring 2005 semester. Her teaching and directing responsibilities ended at the end of the fall 2004 semester. From 2000-2004, eight faculty have not been recommended for retention and/or tenure based on performance and recommendation through the extensive university tenure/promotion process. Of those, two were African American. This does not include one black faculty member whose tenure track appointment was not renewed due to downsizing of the Developmental Studies Program or Dr. Dawson, who chose not to apply for retention. (Id. ¶¶ 18-27, 40.)

Dr. Hoppe directed an investigation into the appearance of a noose on campus in October 2003. She twice addressed the campus community through university-wide email about the situation on October 21 and 23, 2003. The conclusion of the investigation was publicly announced in the *Leaf-Chronicle*, a Clarksville newspaper, on November 18, 2003. Subsequently, a member of the local NAACP chapter asked the U.S. Dept. of Education Office of Civil Rights to investigate the incident. That investigation resulted in a finding that the university handled the incident appropriately. Any decision about Dr. Dawson's retention was separate and unrelated to any statements she made about the noose. (Id. ¶¶ 28-34.)

Dr. Hoppe's affidavit in Dr. Dawson's case reiterates much of the same statistical information stated above in Dr. Wade's case with regard to Dr. Hoppe's support of African American faculty and staff. Throughout her tenure as President, the number of African American faculty ranged from 17 to 21. (Id. ¶¶ 35-41.)

According to Dr. Speck, Dr. Dawson's contract did not specify that the AASP would remain under Dr. Filippo. Such a stipulation would contradict the authority of the President to reorganize the university. During the reorganization, Dr. Speck consolidated the duties of his two Assistant

25

Vice Presidents and eliminated one vice president position. The Enrichment Programs unit was integrated into the other colleges. Because all of the professors in Enrichment Studies except Dr. Dawson also reported to a department as part of the restructuring, Dr. Dawson also had to be assigned to a department. (Docket Entry No. 187, Speck Aff. ¶¶ 5, 7.)

The Court has also considered the affidavits of James Diehr and Richard Jackson and the unauthenticated documents presented by APSU in support of its motion for summary judgment, even though those materials are not summarized here. The Court has further considered the affidavit of Dr. Wade submitted by Dr. Dawson, as well as the unauthenticated documents Dr. Dawson produced in opposition to the motion for summary judgment.

Ms. Warner

In August 2001, Ms. Warner was hired at APSU as a tenure track Assistant Professor of English for the Developmental Studies Program ("DSP"). Previously, she was employed for five years at Tennessee State University and moved to ASPU only because she was offered a tenure-track position. During the 2001-2002 academic school year she received very high evaluation scores from students and positive reviews from superiors. In March 2002, however, she was informed that her contract to teach in all probability would not be renewed. (Docket Entry No. 223, Warner Aff. ¶¶ 2-3.)

In response to the letter of possible non-retention, Dr. Aleeta Christian, chairwoman of Developmental Studies, submitted a memorandum to Dr. Bruce Speck, Vice President of Academic Affairs. She contended that Ms. Warner's position in Developmental Studies was essential to African American student retention. Ms. Warner was the first and only full-time tenure track professor in Developmental Studies and a large percentage of the students were African American.

26

According to Ms. Warner, Dr. Hoppe did not like Dr. Christian's report and began to retaliate against Ms. Warner. (Id. ¶¶ 4-5.)

Shortly after receiving the letter of potential non-retention from Dr. Hoppe, Ms. Warner and 23 other faculty members were placed in three tiered categories. Ms. Warner was placed in the third and last tier along with a white female, Nancy Matthews, who also taught in Developmental Studies. Even though Dr. Hoppe argued that Ms. Warner's termination was due to budget cuts, Ms. Warner was the only faculty member of the 24 placed into the three tiers to be eliminated. Nancy Matthews was allegedly told about other internal positions within APSU for which she could apply. Ms. Matthews' husband was a tenured APSU faculty member. In contrast, Ms. Warner was only offered short-term employment. Dr. Hoppe suggested that Geier money was to be used where there were very few African Americans, but that was not the case with regard to Ms. Warner. Ms. Warner asserts that President Hoppe did not like African American women. (Id. ¶¶ 7-8.)

Ms. Warner avers that Dr. Christian offered her a short-term contract to teach at Fort Campbell; however, Dr. Hoppe ordered Ms. Warner to vacate her office. Confused, Ms. Warner made an appointment to see Dr. Hoppe. Ms. Warner explained that she had a short-term contract. President Hoppe was totally unaware that Ms. Warner had accepted a contract to teach at Fort Campbell. Because she was uninformed, Dr. Hoppe asked that Ms. Warner give her time to look into the situation. Ms. Warner left the meeting thinking all was well. The following morning, Ms. Warner received a phone call at home from President Hoppe, who seemed angry, but Ms. Warner did not know why. President Hoppe stated that she had approved the contract to teach at Fort Campbell, but make no mistake "you will not get another one." With that statement, Dr. Hoppe severed the phone call before Ms. Warner could respond. (Id. ¶¶ 9-10.)

27

Ms. Warner met with Richard Jackson on two occasions asking him to investigate why she warranted such treatment and why she was the only faculty member in the three tiers who was terminated. She also submitted email communications to set the appointments and set forth the discussion that she wanted to pursue. She met with Mr. Jackson in his office next to the president's suite. She lodged a complaint and requested an investigation, which Mr. Jackson refused. He told Ms. Warner that she had not been treated differently than others and she had no basis to claim discrimination because she did not have any one to whom to compare her situation. Mr. Jackson reiterated the same information at a second meeting at Shoney's. She wanted the paperwork to file a formal complaint, but no record of her meeting with him to file a complaint was documented. (Id. ¶¶ 11-13.)

For the next two months, Ms. Warner claims she existed on the APSU campus on an island disconnected from all involvement in being an active member of the campus community. She was no longer informed of faculty meetings. She was not allowed to continue as a committee chair. Peers stopped talking to her except to whisper apologies for her plight. She felt she was in a hostile work environment and her dreams and career had been shattered. (Id. ¶ 14.)

According to Ms. Warner, Dr. Hoppe and human resources personnel blocked or dismissed any openings for which she applied from that point on even though she solicited recommendations stating her qualifications. The Department of Labor referred her several times to APSU for openings; yet, each time she applied, the positions were closed or reneged upon because of "budget cuts." DES personnel thought the situation laughable because two of the positions for which she applied had been in their system for months with no qualified applicants to refer. (Id. ¶¶ 15-16.)

When Ms. Warner applied for the position of Instructor in English, she felt she was more than qualified. Although APSU contended that she was not qualified to teach World Literature, Ms. Warner had taken a number of courses in a variety of literatures of the world, as specified on her academic transcript. Ms. Warner filed suit when she could not obtain redress elsewhere. (Id. ¶¶ 17-20.) The Court has considered the unauthenticated documents Ms. Warner submitted in opposition to the summary judgment motion even though they are not summarized here.

Dr. Hoppe attests that Ms. Warner was employed at APSU from August 2001 through December 2002 as an Assistant Professor of Development Studies. On March 14, 2002, during her first year of tenure-track employment, she was notified that her position was being eliminated due to budget cuts. This notification was given pursuant to APSU and TBR policies, which require that first-year tenure track faculty be notified of non-renewal by April 1 of the year that the employee's contract expires. (Docket Entry No. 208, Hoppe Aff. ¶¶ 5-7.)

Faculty targeted for position elimination were placed into three tiers based on the following criteria: (a) critical need for instruction based on student credit hour production compared to current number of full-time faculty in each disciplinary area; (b) number of part-time faculty used and/or available in a discipline; (c) accreditation issues; and (d) long-term availability of funding for the discipline. Developmental Studies fell in the third tier because it only met one of four criteria. Although there was a critical need for instruction based on student credit hour production, part-time faculty were readily available, especially in English, Ms. Warner's discipline; no accreditation issues were involved; and long-term funding was to be cut dramatically by the TBR and the Tennessee Higher Education Commission. In contrast, areas in the first tier, such as chemistry and nursing, not only had a critical need for instruction, but there was not a ready supply of part-time faculty,

29

accreditation would have been affected if the positions had been cut, and long-term availability of funding for the disciplines was certain. Similar reasons, at a lesser level, existed for disciplines in tier two, such as education. Tier three included some disciplines that were also in higher tiers (this would have been a second faculty position for the discipline) and also included areas like the library. In the final decision, the only two faculty not renewed were in Developmental Studies. The primary factor for this was the TBR/THEC decision to downsize Developmental Studies in universities and their concurrent decision to reduce state funding and tuition levels by $500,000 to $600,000 in 2003 for institutions that continued to offer these programs. Therefore, in addition to the university-wide budget cuts, Developmental Studies, in which Ms. Warner was employed, was subject to an additional state mandated budget cut. TBR and THEC determined that universities should discontinue offering remedial level courses and that funding for Developmental Studies courses (equivalent to 9 - 12 grade level skills) at universities would be reduced to the funding level for community colleges. Also, the TBR mandated that, effective fall 2005, universities could only collect community college tuition for Developmental Studies, which would cause a further budget reduction of approximately $650,000.

To prepare for the funding and tuition reductions, APSU made the decision not to tenure any more faculty in the Developmental Studies Department and to seek less expensive ways to provide Developmental Studies. There were only two Developmental Studies faculty members who were not tenured and thus, neither tenure-track contract was renewed. Ms. Warner was subjected to standard academic processes and procedures in accordance with TBR and APSU policies. APSU was under no obligation to use Geier funds to continue the position. With limited Geier funds, to underwrite the Developmental Studies Program position would have required a reduction in

30

scholarships for black students and financial assistance to black faculty and staff who were pursuing degrees. (Id. ¶¶ 8-13, 27.)

Ms. Matthews, a Caucasian, was continued for one year in a temporary faculty position and subsequently selected for another position for which she applied and was qualified. Her discipline was math, not English like Ms. Warner. During the 2002-2003 academic year, the university's need for faculty to teach courses in developmental math significantly exceeded the need in English. As indicated in her 2001-2002 employment agreement, Ms. Matthews had sufficient prior higher education teaching experience to qualify for one year credit toward tenure, requiring under normal circumstances notification of non-renewal by January 1 of the year that her contract expired. Ms. Warner's contract did not so provide. To accommodate the fact that Ms. Matthews was not notified of non-renewal until well after January 1, she was provided with full-time employment for the entire 2002-2003 academic year. During spring 2003, she applied for and was selected for the Regents' Online Resource Coordinator position. (Id. ¶¶ 14-15, 17.)

Ms. Warner was also provided with full-time temporary employment through December 13, 2002. Thereafter, she was employed at APSU as an adjunct (part-time) faculty member from January 6, 2003 through May 8, 2003 and August 18, 2003 through December 12, 2003. (Id. ¶ 18.)

Ms. Warner filed an EEOC charge on October 8, 2003. The charge alleged discrimination based on an application for a position in January 2003 and also alleged that she was denied a faculty position in February 2003 based on her race. APSU has no record of Ms. Warner applying for a position in January 2003. Ms. Warner submitted a letter dated November 14, 2002 requesting that she be considered for the position of Assistant Professor of Professional Studies. The search process for the position was canceled and the position was not filled due to budget cuts. (Id. ¶ 19.)

31

Ms. Warner applied for the position of Retention Specialist prior to September 2003. Her application was reviewed by the selection committee, which included African-American representation. The search was stopped in December 2003 and the position was not filled due to anticipation of a potential impoundment in the spring. Ms. Warner also applied for Instructor of English at Fort Campbell in January 2004. Again, her application was reviewed following standard university procedures. The selection committee, which included African-American representation, did not select Ms. Warner for interview and Human Resources records indicate that her lack of teaching experience in World Literature was a factor in her non-selection. The requirement for being able to teach World Literature was included in the position description. (Id. ¶ 20.)

Dr. Hoppe's affidavit in Ms. Warner's case reiterates much of the same statistical information stated above in Dr. Wade's and Dr. Dawson's cases with regard to Dr. Hoppe's support of African American faculty and staff. (Id. ¶¶ 21-26.)

The Court considered the unauthenticated documents submitted by APSU in support of its summary judgment motion and by Ms. Warner in opposition to the motion.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson

v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

**A.  Timeliness of Ms. Warner's claim concerning non-renewal of her contract**

Before bringing suit under Title VII for discrete acts of racial discrimination, Ms. Warner was required to file timely charges with the EEOC within 300 days of each discrete discriminatory act at issue or lose her ability to recover for that act.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002).  APSU contends that Ms. Warner was notified of the nonrenewal of her teaching contract on March 14, 2002.  As a result, she had 300 days, until January 8, 2003, to file the requisite charge of alleged race discrimination with the EEOC.  However, Ms. Warner did not file an EEOC charge until October 8, 2003, and that charge related to the failure of APSU to hire her in another position for which she applied.  Thus, APSU contends that any complaint of

33

discrimination relating to the nonrenewal of Ms. Warner's Developmental Studies contract must be dismissed for failure to comply with the statutory limitations period.

The Court agrees that any claim Ms. Warner may have concerning the nonrenewal of her contract is time-barred under Title VII due to her failure to file an EEOC charge by January 8, 2003. See Morgan, 536 U.S. at 110. The same claim brought under the THRA is also time-barred. The THRA claim is subject to a one-year statute of limitations. Tenn. Code Ann. § 4-21-311(d); George v. Aventis Pharmaceutical, Inc., 252 F.Supp.2d 599, 607 (W.D. Tenn. 2003); Pearison v. Pinkerton's, Inc., 2003 WL 21212651 at *4-5 (E.D. Tenn. 2003). Thus, the time within which Ms. Warner could proceed on a THRA claim for her contract nonrenewal expired on March 14, 2003.

APSU does not raise any similar claims of untimeliness with regard to other discrimination or retaliation claims brought by Ms. Warner, Dr. Wade or Dr. Dawson.

## B. Race discrimination claims

The Plaintiffs agree that they must prove their claims of race discrimination through circumstantial evidence by application of the familiar burden-shifting formula.[3] See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-143 (2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973). To establish a *prima facie* case of race discrimination in a run-of-the-mill case, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was replaced by, or treated differently than, a similarly situated employee who is not a member of the protected class. See

_____

[3]The Court may consider together the theories brought under Title VII and the THRA. See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).

Laderach v. U-Haul of Northwestern Ohio, 207 F.3d 825, 828 (6th Cir. 2000). Once the plaintiff establishes a *prima facie* case, an inference of discrimination arises. See id. The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. Once that reason is identified, the burden shifts back to the plaintiff to prove that her employer's articulated non-discriminatory reason for its action was merely a pretext for unlawful racial discrimination. Id. To show pretext, a plaintiff must prove the employer's asserted reason had no basis in fact, the reason did not in fact motivate the adverse employment action, or the reason was insufficient to motivate the adverse employment action. Id. The plaintiff carries the ultimate burden to prove race discrimination by a preponderance of the evidence. Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995).

All three Plaintiffs satisfy the first element. They are members of the protected African American class.

As to the second element, the Court will assume for summary judgment purposes that Dr. Hoppe changed the material terms of Dr. Wade's employment contract when she reduced the length of the contract and Dr. Wade's salary, and that Dr. Wade's resignation thereafter amounted to a constructive discharge. The Court concludes that Dr. Wade satisfies the second element of showing an adverse employment action.

Dr. Dawson declined to submit her dossier to be considered for retention and as a result APSU notified her that her contract would not be extended. The Court believes a close question is presented whether Dr. Dawson suffered an adverse employment action at the hands of APSU administrators. Nonetheless, the Court will assume for summary judgment purposes that Dr. Dawson satisfies the second element.

Ms. Warner satisfies the second element because she has shown that she was not hired for the position of Retention Specialist or Instructor of English. These are positions for which she applied.

As to the third element, Dr. Wade has shown that she was qualified to hold her position as director of the AACC. There is some evidence in the record that Dr. Dawson was not performing to expectations on all of her responsibilities as director of the AASP program; however, the Court will assume for summary judgment purposes that Dr. Dawson was qualified to continue in her position had she submitted her dossier and been approved for retention. Ms. Warner has shown that she was qualified for the position of Retention Specialist, but there is some question whether she was qualified for the position of Instructor of English where the job description required ability to teach World Literature, and she may or may not have been qualified to do that. The Court will assume for summary judgment purposes that Ms. Warner was qualified to teach these courses.

The *prima facie* cases of Dr. Wade and Dr. Dawson falter on the fourth element. Neither Plaintiff produced evidence to show that she was replaced by, or treated differently than, a similarly situated employee who was not a member of the protected class. See Laderach, 207 F.3d at 828.

The fourth element for Ms. Warner's claim is different. In the failure to hire context, the plaintiff must show that she was rejected for the position for which she applied and that the employer continued to seek applications from persons with plaintiff's qualifications and/or that a person outside the plaintiff's protected class was hired. McDonnell Douglas, 411 U.S. at 802; Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 165 n.12 (6th Cir. 2004). Ms. Warner has not produced any such evidence.

36

Thus, the Court concludes that the Plaintiffs' claims of race discrimination do not survive the test of the *prima facie* case.

Even assuming that each Plaintiff did set forth a *prima facie* case, the burden of production shifts to APSU to show a legitimate, non-discriminatory reason for the action it took with regard to each Plaintiff. APSU presented extensive evidence of the budgetary pressures it faced between 2000 and 2004, and it presented evidence of the factors which guided administrators in cutting budgets and eliminating positions. Moreover, APSU presented evidence explaining the process of reorganizing the university structure and the factors which guided administrative decisions to move the AACC and the AASP under the Dean of the College of Arts and Letters and to assign Dr. Dawson to the department of history for locus of tenure and personnel issues. APSU presented evidence explaining that Ms. Warner was not chosen for the Retention Specialist position because the position was never filled due to budget cuts, and Ms. Warner was not chosen for the Instructor position because she lacked the qualifications to teach World Literature.

APSU having established legitimate, non-discriminatory reasons for its actions, the burden swings back to Plaintiffs to show that the reasons articulated by APSU for its decisions had no basis in fact, or the reasons given did not in fact motivate the adverse employment actions taken against the Plaintiffs, or the reasons given were insufficient to motivate the adverse employment actions taken against the Plaintiffs. At this point the Plaintiffs' claims again fail. Plaintiffs have not challenged the budgetary figures and statistics presented in APSU's affidavits to show that there was no basis in fact for the university's decisions. Plaintiffs make conclusory allegations that they believe, from their subjective perspective, that the reasons given by APSU did not in fact motivate the adverse employment actions taken against them. But self-serving assertions are not enough to

Case 3:05-cv-00076   Document 238   Filed 01/16/08   Page 37 of 45 PageID #: 2622

survive summary judgment. Plaintiffs must produce admissible evidence that the reasons given by APSU did not in fact motivate the adverse employment actions taken against them or that such reasons were insufficient to motivate the adverse employment actions taken against the Plaintiffs.

The question is not whether APSU exercised prudent business judgment, but whether the Plaintiffs have come forward with evidence to refute the legitimate reasons given for the actions taken against them. See Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986). The Plaintiffs' perception of themselves is not relevant. Rather, it is the perception of the decision maker that is relevant. See id. at 464-465. Plaintiffs' self-serving and conclusory declarations of race discrimination in employment decisions affecting them, without specific evidence proving the existence of such race discrimination, is insufficient to show pretext and preclude the entry of summary judgment against them. See Anderson, 477 U.S. at 248; Lewis v. Philip Morris Inc., 355 F.3d 515, 533 (6th Cir. 2004); Evans v. Jay Instrument and Specialty Co., 889 F.Supp. 302, 310 (S.D. Ohio 1995). Accordingly, the Court holds that APSU is entitled to summary judgment on each of the Plaintiffs' claims for race discrimination.

## C. Hostile work environment claims

A hostile work environment exists if the workplace is permeated with racially discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the plaintiff's employment, and if an objectively reasonable person would view, and the plaintiff herself did view, the environment as abusive. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 81 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).

To establish a prima facie case of a hostile work environment, a plaintiff must show five elements: (1) she was a member of a protected class; (2) she was subjected to unwelcome

38

harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). Whether a work environment is racially hostile or abusive can be determined only by looking at all of the circumstances. Harris, 510 U.S. at 23. Here, the Plaintiffs perceived the work environment as racially hostile, but the racial harassment alleged was not so severe and pervasive as to require jury trial on the issue. See Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998); Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000).

Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at intentional discrimination based on a protected category, such as race. See Oncale, 523 U.S. at 80; Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000). The critical issue is "'whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed.'" Id. (quoting Harris, 510 U.S. at 25)). The inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the individual. Oncale, 523 U.S. at 81. In determining whether the alleged harassment was sufficiently severe and pervasive, the Court must consider the totality of the circumstances. Williams v. General Motors Corp, 187 F.3d 553, 562 (6th Cir. 1999). The Court must take into account the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23. Moreover, personal conflict "does not equate with discriminatory animus." Morris, 201 F.3d at 791; Barnett v. Department of Veterans Affairs, 153 F.3d 338, 342-343 (6th Cir. 1998). None of the three Plaintiffs

has presented sufficient evidence to proceed to trial on a claim of a hostile work environment based on race. The Court will first consider the claims of Dr. Wade and Ms. Warner and then turn to the claim of Dr. Dawson.

In her memorandum in opposition to the summary judgment motion, Dr. Wade contends she was subjected to a racially hostile work environment because: in a meeting held in May 2000 Dr. Hoppe indicated by her demeanor and body language that she was dissatisfied with an answer Dr. Wade gave to a question asked by Dr. Hoppe; in June 2000 Dr. Hoppe told Dr. Wade that the AACC's Secretary III position would be frozen and the summer worker positions would be eliminated, and when Dr. Wade asked for reconsideration Dr. Hoppe allegedly stated this "should teach you to decide which side you are on"; in July 2000 Dr. Hoppe eliminated the AACC's programming budget and Dr. Hoppe rejected Dr. Wade's request for restoration of the budget or use of Geier funds; and Dr. Wade's superiors did not recruit her for internal promotions or notify her of internal promotion opportunities that were not publicly advertised, as were several Caucasian employees. Dr. Wade stated in her affidavit that, during a meeting about the future of the AACC and AASP, Dr. Speck told her he would not tolerate her "pushiness" and "uppityness."

In her memorandum in opposition to the summary judgment motion, Ms. Warner does not identify any particular facts which she says created a racially hostile work environment. In her affidavit, she did not identify any facts showing that APSU administrators subjected her to comments, remarks, or actions that could be viewed as racial epithets, insults, intimidation, or ridicule.

Dr. Wade and Ms. Warner did not produce any evidence to show that APSU's decisions or actions concerning them were driven by racially discriminatory animus as opposed to pressing

financial difficulties faced by the university. See Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987) ("In a Title VII claim, it is the employer's motivation and intent, not its business judgment, that is at issue.") While Dr. Wade and Ms. Warner may have felt subjectively that they were working in a racially hostile environment, that is only half of the proof equation. They must also produce evidence to show that their work environment was permeated with racially discriminatory intimidation, ridicule, and insult on the part of APSU administrators and/or employees such that a reasonable person, viewing the situation objectively, would conclude that the environment was racially abusive. See Oncale, 523 U.S. at 81; Harris, 510 U.S. at 21-22.

Ms. Warner has produced no such evidence. Dr. Wade attests to one comment Dr. Speck made remarking on her "uppityness." Taking as true that Dr. Speck made this comment and taking as a given that Dr. Wade felt this comment was racially offensive to her, the remark is nonetheless isolated in this voluminous factual record. Dr. Wade has not pointed the Court to any other similar comment made to her by an APSU administrator or employee at any time. Offhand comments or isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. In re Rodriguez, 487 F.3d 1001, 1010 (6th Cir. 2007) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). The other incidents of which Dr. Wade complains show at most the existence of interpersonal conflict between Dr. Wade and Dr. Hoppe concerning the funding and staffing of the AACC. See Morris, 201 F.3d at 791. The single comment attributed to Dr. Speck, even considered in the totality of all the circumstances, is not enough evidence to proceed to jury trial. See Clay v. United Parcel Serv., Inc., 501 F.3d 695, 707 (6th Cir. 2007) (noting Sixth Circuit has affirmed grants of summary judgment where evidence of

41

severity or pervasiveness is insufficient to proceed to trial). The claims of Dr. Wade and Ms. Warner do not meet the requirements of the law to show severe and pervasive racial harassment.

Dr. Dawson's hostile work environment claim relies on two specific incidents: the discovery of a noose on campus and as she terms it, "the false rape incident." (Docket Entry No. 215, Memorandum at 11.) She also contends that these two incidents, "among other situations at APSU" created a hostile work environment which interfered with her work performance.

The presence of a noose on the APSU campus is certainly a matter of concern, and is the type of incident that, if ignored by the APSU administration, could warrant potential relief in a federal court. See E.E.O.C. v. Northwest Airlines, Inc., 188 F.3d 695, 702 (6th Cir. 1999). The evidence in this case shows, however, that Dr. Hoppe and the APSU administration did not ignore the incident. Rather, the noose was removed, the campus police chief issued an official university statement in an email that was approved by Dr. Hoppe, and an investigation was conducted to try to identify those responsible, even though the investigators ultimately were unsuccessful in identifying a perpetrator. Dr. Hoppe addressed the issue in two campus-wide emails she sent to students and staff requesting cooperation with investigators and expressing the university's goal to create a campus climate welcoming and comfortable for all, the university's lack of tolerance for prohibited acts of intimidation and harassment, and the university's pledge to take appropriate action if any one determined to be responsible was a member of the campus community. The result of APSU's investigation was published in the local media. The U.S. Department of Education Office of Civil Rights investigated the incident at the request of the NAACP and concluded that APSU handled the matter appropriately. Although serious, this incident was isolated and Dr. Dawson has not produced evidence of any similar incidents that occurred on the APSU campus. She also has

42

not produced any evidence that she was subjected to racial epithets, ridicule or intimidation of any kind. Dr. Dawson contends that the "false rape incident" was humiliating to her and career-damaging. Taking the facts of this event in the light most favorable to Dr. Dawson, the evidence shows that Mr. Jackson, Dr. Filippo, and a representative from the campus police asked to meet with Dr. Dawson with some urgency during a class period to interview her about facts relating to an alleged rape of a student by a university professor. These investigators were sent by Dr. Hoppe, and all were under the impression that Dr. Dawson had earlier reported a rape incident to Dr. Meningall which required investigation. Dr. Dawson told the three investigators that she did not call Dr. Meningall to report any such incident and she did not know anything about it. Subjectively, Dr. Dawson may have felt humiliated in some way as a result of being approached in this manner, but she has not presented any evidence that a reasonable person looking at all of the facts objectively would find that Dr. Dawson was subjected to a work environment permeated with racially discriminatory ridicule, intimidation, or insult to alter the terms and conditions of her employment.

The Court concludes that all three Plaintiffs have failed to produce sufficient evidence on their hostile work environment claims to warrant proceeding to a jury.

## D. Retaliation claims

To establish a retaliation claim, a plaintiff must show that (1) she engaged in protected activity, (2) the employer knew that she did, (3) the employer thereafter took adverse employment action against her, and (4) there was a causal connection between the protected activity and the adverse employment action. Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to produce a legitimate, non-retaliatory reason for the adverse action taken against the plaintiff. Randolph v.

43

Ohio Dept. of Youth Servs., 453 F.3d 724, 737 n.4 (6th Cir. 2006). The burden then shifts back to the plaintiff to establish that the reason proffered by the defendant was merely pretextual and that the actual reason was retaliation for engaging in protected activity. Id.

The Plaintiffs essentially assert that every decision affecting their employment at APSU was retaliatory. The Court believes there is a close question presented as to whether the Plaintiffs adequately established a causal connection between each of the Plaintiffs' expressions about race discrimination and each one of the numerous acts of alleged retaliation of which the Plaintiffs complain. Nonetheless, the Court will proceed with the analysis as if each Plaintiff can establish a *prima facie* case of retaliation for complaining to university administrators and the EEOC about race discrimination.

The burden of production shifts to APSU. Defendant produced significant evidence that the actions it took toward each Plaintiff were determined by necessary business decisions required in the face of substantial funding cuts or university reorganization which affected all academic departments and programs, and that its actions were not driven by an intent to retaliate against the Plaintiffs for their protected conduct.

The burden thus shifts back to the Plaintiffs to show that Defendant's proffered reasons are a pretext for retaliation. The Court cannot conclude on this record that Plaintiffs have produced sufficient evidence of pretext to proceed to a jury. Plaintiffs have not produced evidence sufficient for a reasonable factfinder to reject the employer's proffered reasons for its actions. See Michael v. Caterpillar Financial Servs. Corp., 496 F.3d 584, 597 (6th Cir. 2007). Plaintiffs have not shown that APSU's proffered reasons had no basis in fact. See id. Plaintiffs presented no evidence that the budget figures and statistics on which APSU relied in making funding and staffing decisions

44

lacked a basis in fact. Plaintiffs do not argue that the effects of university-wide reorganization as described by APSU administrators lacked a basis in fact. Moreover, other than their own self-serving observations that APSU retaliated against them, Plaintiffs have not presented any evidence to show that the reasons given by APSU administrators for their actions did not actually motivate their challenged conduct or were insufficient to warrant the challenged conduct. Corrigan v. U.S. Steel Corp., 478 F.3d 718, 727 (6th Cir. 2007) (affirming summary judgment in age discrimination case where plaintiffs offered only conclusory statements that defendant's reasons were pretextual and did not support their claims with evidence of pretext). Therefore, because Plaintiffs have not presented evidence of pretext, their retaliation claims must fail.

## IV. **CONCLUSION**

For all of the reasons stated, Defendant Austin Peay State University's Motion For Summary Judgment As To Plaintiff Jacqueline E. Wade (Docket Entry No. 176), Motion For Summary Judgment As To Plaintiff Nancy J. Dawson (Docket Entry No. 183), and Motion for Summary Judgment As To Plaintiff Mary M. Warner (Docket Entry No. 205) will be granted. These actions will be dismissed with prejudice.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE